UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:21-cr-58-FL

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>QUAMAINE DONELL SMITH | Sentencing Memorandum<br>(Resentencing upon Remand) |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, hereby submits this sentencing memorandum in anticipation of Defendant Quamaine Donell Smith's resentencing on remand. For the reasons discussed below, the United States seeks an upward variance of 21 months to a total sentence of 192 months' imprisonment.

## Introduction

Defendant was originally sentenced in May 2022. D.E. 63 (original judgment). Following Defendant's successful appeal, the case was remanded for resentencing and reassigned to this Court. *United States v. Smith*, 134 F.4th 248 (4th Cir. 2025).

In September 2025, this Court will resentence Defendant on a clean slate. While imposing a higher sentence on remand ordinarily creates a presumption of vindictiveness when the district court does not explain the reason for the increase, this presumption does not apply to a resentencing hearing before a new judge. *See, e.g., United States v. Mathurin*, 868 F.3d 921, 936–37 (11th Cir. 2017). "The presumption of vindictiveness is 'inapplicable [when] different sentencers assessed the varying sentences.'" *United States v. Valdez-Lopez*, 4 F.4th 886, 891 (9th Cir. 2021) (quoting *Texas v. McCullough*, 475 U.S. 134, 140 (1986)). Accordingly, this

Court must conduct its own independent evaluation of the § 3553(a) factors and cannot rely on the original sentencing and its inadequate sentencing explanation.

The United States previously recommended "a term of incarceration that is within the guideline range [on Count One] followed by the consecutive 84 months for the 924(c)." *See* D.E. 70 at 6 (Sentencing Transcript). Defendant's post-sentencing conduct, discussed below, has changed the government's assessment of the § 3553(a) factors and its sentencing recommendation.

## Discussion

Defendant's advisory guidelines range is 70 to 87 months for Count One (Hobbs Act robbery) and 84 months, consecutive, for Count Two (§ 924(c) brandishing).[1] A total sentence exceeding the top of Defendant's combined guidelines range is appropriate based on the nature and circumstances of the offense, Defendant's troubling post-sentencing conduct, his history and characteristics, and the need for incapacitation and deterrence.

---

[1] Count One's guidelines range is different on remand because Defendant's criminal history category was updated to reflect a 17-to-30-month state sentence for interfering with electronic monitoring, criminal conduct that preceded the instant offenses. *See* PSR ¶ 32 (noting a pending Craven County charge at case no. 20CRS51267); N.C. Dept. of Adult Corr., Offender Search for Quamaine Smith, https://webapps.doc.state.nc.us/opi/offendersearch.do?method=view, last accessed 8/19/2025; *see also* PSR ¶¶ 29–30 (reflecting seven criminal history points originally); U.S.S.G. § 4A1.1(a) (requiring three criminal history points for this new conviction and sentence); U.S.S.G. Ch.5 Pt.A (assigning a criminal history category V to defendants with 10 to 12 criminal history points).

## Nature and circumstances of the offense

With this memorandum, the government is providing an exhibit list and several exhibits. Exhibit 1 is DVD with a video recording of Defendant's senseless, violent offense.[2]

May 17, 2021, was a typical Monday night at the Five Points Mini Mart on National Avenue in New Bern, North Carolina. Patrons came and went from the store, chatting with each other and with the twenty-year-old college student working the cash register. Three store patrons were in line to make purchases when the normalcy of that night shattered. Defendant and Francesco Greco, Jr., rushed through the door, faces covered and weapons at the ready. Defendant pointed a silver revolver at the cashier, and Greco wielded a tire iron. From across the counter, they ordered the cashier to open the safe.

When the cashier attempted to walk behind the counter towards a doorway at the rear of the store, Defendant asked, "Where the fuck you going?" He quickly moved around the counter to block the potential exit, pointed the gun at the cashier, and then smashed the revolver against the back of the cashier's head. The video captures the chilling sound of metal hitting bone and shows the cashier crumple as blood flows from his headwound. Defendant simply reached over the cashier's writhing body to grab money from a shelf underneath the register, which he put on the counter for Greco to take.

---

[2] This exhibit runs for approximately 1 minute and 45 seconds and is a segment from a longer video Defendant received in discovery.

The government will file a separate motion seeking leave to manually file this DVD exhibit and deliver it to the Clerk's Office at the United States District Court in New Bern.

Both Defendant and Greco demanded that the cashier get up and open the safe and the cash register, as shown in the image below.



*See* Exhibit 1 at 0:25. With one hand pressed on the base of his skull and blood streaming down his neck, the cashier opened the register drawer, which Greco emptied. Meanwhile, Defendant grabbed packs of cigarettes and tossed them on the counter. Throughout the robbery, Defendant repeatedly pointed the revolver at the cashier, told him not to move, and threatened to kill him.

Defendant and Greco fled the scene in a getaway SUV driven by Justin Pickens. *See* PSR ¶¶ 11–12; D.E. 71 at 20–22. They were discovered at Pickens's mother's house the next day. PSR ¶¶ 11–12; D.E. 71 at 9–23.

Defendant's actions show his utter disregard for the law and the physical safety of others. He was willing to use the weapon he brought to this neighborhood convenience store, and he did not care who he hurt in the process of obtaining money and cigarettes. His sentence must reflect the egregiousness of this conduct.

### *Defendant's post-sentencing conduct*

Defendant's post-sentencing conduct, as reflected in Bureau of Prisons records, calls into question whether he has learned from or wants to atone for his mistakes. *See* Exhibits 2–6B.

First, BOP records reflect limited effort by Defendant to avail himself of the education and vocational training, substance abuse treatment, and mental health counseling he sought at his initial sentencing hearing. See D.E. 70 at 4; Exhibit 2. According to his program review, Defendant enrolled in pre-GED classes in July 2024 and has otherwise completed two self-study courses lasting between four to six weeks since arriving at USP Hazelton in late 2022. Exhibit 2 at 1–2. He failed his drug education assignment, though he is on a waiting list for nonresidential drug treatment. *Id.* at 2.

Second, BOP records reveal Defendant's failure to make any meaningful progress on his restitution obligations. *See* Exhibit 2 at 2. According to his June 2025 BOP Program Review, Defendant has paid his $200 special assessment and $10 towards the $7,020.18 restitution he owes to the store, the victim cashier's health insurance company, and the victim cashier for medical expenses. *Id.* at 2. Defendant is refusing to participate in the inmate financial responsibility program and made no payments during the first half of 2025 towards the remaining $7,010.18 restitution balance. *Id.* Despite being cleared to work in prison in July of 2022—including in food service, an area where he reports having marketable skills, PSR ¶ 61— Defendant has not held a work assignment while in BOP custody. *See id.* Defendant's apology letter to the cashier, *see* PSR ¶ 13, rings hollow in the context of Defendant's unwillingness to make progress on his financial obligations to his victims. A remorseful person's actions would reflect a commitment to making his victims whole by, among other things, working towards paying the court-ordered

5

Case 4:21-cr-00058-FL   Document 112   Filed 08/22/25   Page 5 of 13

restitution. Instead, Defendant's behavior casts doubt on his earlier claims that he is committed to righting his wrongs and using his time in custody productively.

Third, Defendant's prison infractions send a clear message that he is unwilling or unable to conform his conduct to the rules, even in a structured environment. Between January 2023 and June 2025, Defendant committed four serious disciplinary violations at USP Hazelton: three incidences of possessing a dangerous weapon and one assault without serious injury. Exhibits 3A-6B.

On January 12, 2023, a correctional officer discovered "a prison made weapon approximately 5 1/2" long sharpened to a point of grey metal" hidden in Defendant's cell. Exhibits 3A at 3 & 3B (photo below). When confronted with the discovery, Defendant admitted that the weapon was his. Exhibit 3A at 3.



On July 25, 2023, Defendant and a fellow inmate assaulted another inmate in the prison recreational yard. Exhibit 4 at 2–3. Footage of the incident reviewed by correctional officers showed Defendant and the other inmate striking their victim in the upper torso with closed fists. *Id.* at 3. A medical assessment of the victim showed injuries consistent with an assault, including a two-centimeter laceration to the right flank. *Id.*

On April 24, 2024, a correctional officer performing a visual search of Defendant asked if he had weapons on his person. Exhibit 5A at 3. Defendant

admitted that he had one in his shoe. *Id.* From Defendant's shoe, the correctional officer recovered "a 5 1/2-inch-long black prison made weapon sharpened to a point on one end, with a brown torn bedsheet handle and a black rubber band." *Id.*; Exhibit 5B (photo below).



On June 3, 2025—several weeks after winning his appeal and while awaiting return to the Eastern District of North Carolina for resentencing—Defendant was caught for a *third* time with a shank. Exhibit 6A at 2–3; *see United States v. Smith*, 134 F.4th 248 (4th Cir. Apr. 14, 2025), as amended May 6, 2025. During a search of Defendant's cell, a correctional officer discovered "a gray metal prison made weapon sharpened to a point on one end with a brown cloth handle approximately 6.75 inches in length." Exhibit 6A at 2–3; Exhibit 6B (photo below). Defendant eventually admitted that the weapon was his. Exhibit 6A at 3. In addition to having what appears to be a sturdy cloth grip, Defendant's most recent shank also featured a lanyard. Exhibit 6B. Rather than learning from his past infractions that he cannot make and possess shanks, Defendant's weapon-making technique seems to be improving with the passage of time.



In less than 2.5 years, Defendant attacked another inmate and possessed three dangerous weapons in a high-security federal penitentiary. Defendant's failure to follow basic prison rules reflects his continued belief that he is above the law and can harm others if it suits him. A significant sentence is necessary to deter Defendant and protect others from his ongoing, dangerous behavior.

### *Defendant's history and characteristics and the need for deterrence and incapacitation*

Defendant's offense conduct and post-sentencing behavior are consistent with an adulthood of poor choices. Defendant is currently 33 years old and a validated member of the United Blood Nation street gang. PSR at 2. His criminal record dates to his late teens and includes 11 North Carolina convictions: nine misdemeanors and two felonies. PSR ¶¶ 19–27. Over half of his convictions involve aggressive conduct or weapons. *See* PSR ¶¶ 19–20, 23–25, 27.

In July 2011, the then 18-year-old Defendant committed simple assault by striking an individual in the face and body with his fist. PSR ¶ 19. In September 2011, he was caught carrying a concealed weapon. PSR ¶ 20.

His criminal behavior continued into his 20's. PSR ¶¶ 21–27. Of note, in July 2014, Defendant assaulted a victim with a pistol and discharged a weapon into an occupied property, felonies for which he eventually received consecutive state sentences of 29 to 47 months. PSR ¶¶ 23–24. While in custody, Defendant received 17 infractions for unknown violations. PSR ¶ 23. His post-release supervision spanned from October 2019 to January 2021 and was rife with violations. PSR ¶ 23. While on post-release supervision, Defendant engaged in new criminal conduct (twice), failed to pay his monetary obligations, possessed alcohol, used drugs, failed to comply with the Security Risk Group Program, failed to report for supervision, violated curfew, and failed to comply with electronic house arrest or monitoring. PSR ¶ 23. While on state post-release supervision, Defendant assaulted four individuals "kicking and punching them with a closed fist." PSR ¶¶ 23, 25.

Defendant robbed the Five Points Mini Mart approximately four months after completing his state post-release supervision. PSR ¶¶ 9, 23. While his related state charges were pending (but before federal indictment), Defendant again engaged in assaultive conduct by striking a victim "in the facial area several times with a closed fist." *See* PSR at 1 & ¶¶ 1, 9, 27.

Defendant's life-long disregard for the law and the rights of others and his unwillingness to learn from past interactions with the justice system demand a lengthy term of imprisonment. Only an above-guidelines sentence will be sufficient, but not greater than necessary, to accomplish the purposes of federal sentencing. *See* 18 U.S.C. § 3553(a).

## Supervised Release

Defendant's struggle to follow the rules for his entire adulthood raises concerns about his reintegration into society and supports a supervised release sentence at the statutory maximum. Accordingly, the government requests supervised release terms of three and five years for Counts One and Two, respectively, to include the Standard Conditions of Supervision as adopted in the Eastern District of North Carolina by Standing Order 21-SO-5. The discretionary conditions included in the Standing Order set forth the basic expectations for a defendant's behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the Court about, and bring about improvements in a defendant's conduct and condition.

Furthermore, the government recommends that the court impose the special conditions detailed in Part G of Defendant's PSR because these conditions serve statutory sentencing purposes of deterrence, public protection, and rehabilitation. 18 U.S.C. § 3553(a)(2)(B)-(D).

The reasons for ordering substance-abuse treatment (to include drug-detection measures) and mental-health treatment during supervised release are self-evident: Defendant has a history of mental health issues and drug addiction, both of which appear to have been exacerbated by his father's death in 2020. PSR ¶¶ 34, 38–40.

The reasons for the support, restitution, and financial conditions are likewise self-evident. Defendant should provide support to any dependent, and he is required to make restitution to his victims. The financial disclosure conditions and prohibitions against incurring new credit will help the probation officer set appropriate collection parameters for monetary conditions, verify and monitor employment, and assist Defendant as he gains control of his financial situation.

The warrantless-search condition is a tool the probation officer can use to ensure that Defendant is not possessing dangerous weapons or engaging in drug possession and abuse while on supervised release. It is appropriate for this condition to extend to Defendant's cellular telephone and other communication devices, as the investigation revealed that Defendant used his cellular telephone in the days leading up to and during the hours after the robbery to contact co-conspirators Greco and Pickens. The phone also contained text messages suggesting Defendant possessed drugs.

With respect to the proposed warrantless-search condition, the government requests that the Court tailor its scope to the facts of this case by replacing the phrase "computer, other electronic communication or data storage devices or media" with "cellular telephone or other electronic communication devices." PSR ¶ 65; *see* 18 U.S.C. § 3583(d). With this modification, the condition would read as follows:

> The defendant shall submit to a search, at any time, with or without a warrant, and by any law enforcement or probation officer, of the defendant's person and any property, house, residence, vehicle, papers, **cellular telephone or other electronic communication devices**, and effects upon reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the defendant, or by any probation officer in the lawful discharge of the officer's supervision functions.

(emphasis added).

## Conclusion

The United States respectfully requests that the Court impose an above-guidelines term of imprisonment of 108 months' imprisonment on Count One and 84 months' imprisonment on Count Two (for a total prison term of 192 months) and a total of five years' supervised release.

Respectfully submitted, this 22nd day of August, 2025.

        W. ELLIS BOYLE
        United States Attorney

BY:   */s/ Kristine L. Fritz*
       KRISTINE L. FRITZ
       Assistant United States Attorney
       Appellate Division
       150 Fayetteville Street, Suite 2100
       Raleigh, North Carolina 27601
       Telephone: (9l9) 856-4530
       Email: Kristine.Fritz@usdoj.gov
       P.A. Bar #202910
       N.J. Bar #029142006

# CERTIFICATE OF SERVICE

This is to certify that the foregoing document was served upon the following counsel for Defendant pursuant to CM/ECF filing and electronic transfer on August 22, 2025:

**Deirdre A. Murray**
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, NC 27601
Phone: 919-856-4236
Fax: 919-856-4477
Email: deirdre_murray@fd.org

        W. ELLIS BOYLE
        United States Attorney

BY:   */s/ Kristine L. Fritz*
       KRISTINE L. FRITZ
       Assistant United States Attorney
       Appellate Division
       150 Fayetteville Street, Suite 2100
       Raleigh, North Carolina 27601
       Telephone: (9l9) 856-4530
       Email: Kristine.Fritz@usdoj.gov
       P.A. Bar #202910
       N.J. Bar #029142006